FILED

2020 Sep-25  PM 12:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **STEVEN BRYON STATON,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION** |
| **ANDREW SAUL,** | ) | **NO. 4:19-CV-1078-KOB** |
| **ACTING COMMISONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On October 13, 2015, the claimant, Steven Staton, filed an application for disability and disability insurance benefits under Titles II and XVI of the Social Security Act. (R. 10). The claimant initially alleged disability beginning on March 1, 2012, because of pins and plates in his right hand, neck pain, back pain, bursitis of his left elbow, left arm and hand pain, and illiteracy. (R. 10, 366). The Commissioner denied the claimant's application on January 21, 2016, and the claimant filed a request for a hearing before an Administrative Law Judge on April 11, 2016. (R. 181, 188). The ALJ held a video hearing on November 29, 2017. (R. 199).

In a decision dated June 27, 2018, the ALJ found that the claimant was not disabled under the Social Security Act and, therefore, ineligible for social security benefits. (R. 10). The Appeals Council denied the claimant's request for review on May 16, 2019. (R. 1). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this

court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated

below, this court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUE PRESENTED[1]

Whether the ALJ's finding that the claimant does not have a medically determinable
impairment or severe impairment at step two lacks substantial evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence

supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422

(11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including

determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at

999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm

those factual determinations that are supported by substantial evidence. "Substantial evidence" is

"more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational

factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a

---

[1] The claimant raises three other issues regarding whether the ALJ properly applied the pain standard; whether he
failed to fully develop the record; and whether the Appeals Council erred in declining to review the ALJ's decision.
However, because the court will reverse on this issue, the court will not address these remaining issues.

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1)   Is the person presently employed?
> (2)   Is the person's impairment severe?
> (3)   Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)   Is the person unable to perform his or her former occupation?
> (5)   Is the person unable to perform any other work within the economy?

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[2]; 20 C.F.R. §§ 404.1520, 416.920; *see also Taylor v. Acting Comm'r of Soc. Sec. Admin.*, 761 F. App'x 966, 967 (11th Cir. 2019).

After the claimant shows a lack of substantial gainful activity, the second step requires the claimant to show he suffers from a severe, medically determinable impairment. 20 C.F.R. § 404.1521(a)(4)(ii).  Finding a severe impairment at step two is a "threshold question" and "allows only claims based on the most trivial impairments to be rejected." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1265 (11th Cir. 2019) (internal quotations and citations omitted).  An "'impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" *Schink*, 935 F.3d at 1265 (quoting *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986)).  "A claimant's burden to establish a severe impairment at step two is only 'mild.'" *Schink*, 935 F.3d at 1265.

## V. **FACTS**

The claimant was forty-nine years old at time of the ALJ's final decision. The claimant was in special education classes, could not read or write, and left high school to work before completing tenth grade. He last worked in 2012, and his past work was as a material hauler, carrying and handling plastic pipes on a production line. He alleges disability because of back and neck pain, pins and plates in his right hand, left elbow bursitis, left arm and hand pain, and illiteracy. (R. 127, 363, 366).

---

[2] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

*Physical Impairments*

On August 29, 2006, the claimant visited AL Orthopedic and Spine Center after suffering an injury to his right hand. Dr. P. Lauren Savage, Jr. diagnosed the claimant with a fractured metacarpal shaft. The claimant underwent hand surgery and screws and a specialty plate were surgically inserted in the claimant's hand to treat his fracture. (R. 436, 444).

The claimant returned to AL Orthopedic and Spine Center several times for post-operation follow-up visits. Dr. Savage's notes from the December 7, 2006 follow-up indicate that the claimant's hand was steadily improving. Dr. Savage reported that the swelling had decreased, and that claimant felt ready to transition to a 12-hour shift at work. Dr. Savage also mentioned that the claimant would be transferred to a new role in his job that would put less stress on his injured hand. By the time the claimant reached his follow-up apportionment on September 4, 2007, about 13 months after the claimant's hand surgery, the claimant reported a "little bit of pulling sensation between his ring and small fingers in the web space area," but Dr. Savage otherwise reported in his notes no evidence of any problems with the screws in his ring finger or the position of his small finger and no impairment. (R. 433-444)).

The claimant sought treatment for neck pain at St. Vincent's Blount County Emergency Department on March 8, 2008. The claimant rated his pain as an 8 out of 10. Dr. Mario Bart Papagni gave the claimant Stadol for pain and ordered X-ray imaging of his cervical and thoracic spine that showed no signs of a fracture but showed "severe right foraminal narrowing at C3-4 and moderate narrowing on the left at this level"; "degenerative changes at C3-4"; and "no obvious fracture, subluxation, or deformity of the thoracic spine." The claimant's pain level at discharge from the ER was a 7 out of 10. (R. 580).

On September 25, 2008, the claimant visited Baptist Health Center, Oneonta complaining that he had "pulled something" in his back while he was lifting and squatting at work. During his physical examination of the claimant, Dr. Toumah Sahawneh noted muscle spasms, decreased range of motion, and vertebral tenderness in the claimant's back.  Dr. Sahawneh's clinical impression was an acute thoracic or c-spine sprain, and he prescribed Toridal for the claimant's pain.  (R. 398-399).

The claimant returned to Dr. Sahawneh on October 23, November 20 and December 2, 2008, each time complaining of pain in his upper and lower back that he described as a "burning and pulling sensation."  Dr. Sahawneh noted muscle spasms and vertebrate tenderness during the physical examination. His clinical impression was that the claimant had acute, chronic pain and myofascial pain in his cervical and lumbar spine, and he referred the claimant to orthopedic surgeon Dr. John Songer for an MRI and a consultation.  (R.  392-397).

The January 14, 2009 MRI ordered by Dr. Songer of the claimant's cervical spine without contrast showed "degenerative disc disease through the cervical region most prominent at C5-6 and C6-7" with no abnormal cord signal; "severe right and mild left foraminal narrowing due to osteophytes"; "broad based disc bulge without significant canal stenosis" and "mild right foraminal narrowing" at C5-6; and "broad based disc bulge asymmetric to the right" and "moderate right foraminal narrowing" with no obvious cord compression at C6-7.  (R. 584).

During 2009, the claimant returned to Dr. Sahawneh on thirteen occasions complaining of pain in his neck and back: January 22, February 6, March 3, March 25, April 24, May 23, June 22, July 4, August 14, September 11, October 15, November 13 and December 11.  During these visits, Dr. Sahawneh noted muscle spasms and tenderness in the claimant's back.  The February 6 notes indicate that Dr. Sahawneh discussed with the claimant the possibility of Dr. Songer

performing surgery on the claimant's back.  The claimant reported that his back pain was getting worse at the June 22 visit, and Dr. Sahawneh prescribed Toradol for the claimant's pain.  Dr. Sahawneh's clinical impression in his September and November notes indicated degenerative disc disease and chronic pain. (R. 376-391, 420-429).

After suffering an accidental gunshot to his upper left arm while cleaning his gun on March 13, 2009, the claimant sought treatment at St. Vincent's Blount County. Dr. Robert Michael Martin's reports indicate the wound was extremely painful, but he found no fracture. Dr. Martin noted possible metallic fragments lodged in the claimant's arm. (R. 384-385).

The claimant returned to Dr. Sahawneh nine times in 2010 continuing to complain about pain in his neck, back, and shoulders.  Dr. Sahawneh's notes indicated tenderness and muscle spasms during the physical examination; worse pain at night; and diagnoses of degenerative disc disease, degenerative joint disease, and chronic pain.  The October 28, 2010 notes indicate "refill Lortab, Valium," but the record is unclear as to when those prescriptions began. (R. 402-419).

The record is sparse from 2011 until August 22, 2012, when the claimant sought treatment at the Emergency Department at Marshall Medical Center North for back and neck pain after a vehicle accident.  He rated his pain at a 7 out of 10 on the pain scale.   X-ray imaging of his cervical spine showed "no evidence of fracture, dislocation or soft tissue abnormality," and Dr. James McAllister characterized the imaging as "unremarkable." (R. 682-686).

The record reflects that the claimant stopped working in 2012 and he no longer had health insurance.  (R.277).  On August 17, 2015, the claimant sought treatment for sharp neck pain at St. Vincent's Blount County Emergency Department. The claimant stated that he had carried his fifty-pound niece on his shoulders the previous day and woke up with sharp pain that

he rated a 7 out of 10 and limited movement in this neck. He also recounted his history of "bone spurs" in his neck but indicated he "has not had surgery."

Dr. Kathleen Bowen examined the claimant and noted in the review of systems that the claimant "has neck pain. Has upper back pain." Her examination revealed that the claimant was "tender to palpation over lower c-spine" and "tender in paraspinous musculature left greater than right." X-ray imaging of the claimant's spine showed "minimal spondylosis"; no "fracture or soft tissue swelling"; and "degenerative disease with no fracture." Dr. Bowen's primary diagnosis for the claimant was "neck pain," and she discharged the claimant with non-refillable prescriptions for several pain medications, including Percocet, Medrol, and orphenadrine citrate. (R. 95, 616, 617, 633).

On November 30, 2015, the claimant's wife completed a "Function Report-Adult" for the claimant because he is unable to read or write anything other than his name. Through his wife, the claimant reported that his neck and spine pain disrupt his sleep about 4 to 5 days out of the week; his hand and back "will not cooperate to put socks & shoes on at times"; and his back and neck hurt more the more he uses them or stands on his feet too long. He stated that he can lift about 20 pounds or less depending on his pain level; can bend and squat but "it's hard to get up due to my back and neck" pain; can walk and stand about 15 to 20 minutes at a time without a break and then would need to rest about 20 minutes; can sit about 30 minutes before he would have to stand because of his pain; and has a hard time concentrating on tasks because of his pain. The claimant said that he worked in his garden sometimes but had to take many breaks and he occasionally went fishing. (R. 320-327).

The claimant saw Dr. John Taylor Jones for a consultative examination at the request of the Social Security Administration on January 9, 2016. The claimant told Dr. Jones about his

history of pain and difficulty in his right hand and chronic pain in his cervical and lumbar spine. The claimant reported to Dr. Jones that his neck and lower back constantly throb; cause difficulty sleeping; and cause occasional numbness down his left arm and hand.  He reported difficulty lifting things, bending, stooping, and standing because of his pain.  The claimant stated that he can "walk very short distances on level ground"; "was told he needs to have surgery but he doesn't have insurance"; but he can feed and dress himself, climb stairs without difficulty, and can turn a doorknob without difficulty.  (R. 449-450).

Dr. Jones noted that the claimant could get up and out of a chair without difficulty; could get on and off the examination table without difficulty; walked without difficulty and with no assistive device; had a normal gait; had no spasms in his back; had normal straight leg raising without pain; could walk on his toes and perform tandem heel walking; could bend over and touch his toes; had normal grip strength of 5/5 in both hands; and had normal fine and gross manipulative skills in both hands.  (R. 450-452).

But Dr. Jones did note that the claimant's "[r]ange of motion was not full in all extremities."  Specifically, he found that the claimant's cervical range of motion flexion was 40 degrees; extension was 50 degrees; lateral flexion was 40 degrees on both sides; and rotation was 60 degrees on both sides.  Dr. Jones also found that the claimant's lumbar range of motion forward flexion was 80 degrees and extension, lateral flexion on both sides, and rotation on both sides were each 20 degrees.

Dr. Jones concluded that the claimant "has no limitations on [his] ability to stand, sit, walk, bend or stoop, reach, handle, lift, carry, see, hear, or with memory or understanding."  (R. 449-453).

On June 21, 2016, the claimant began visiting Quality of Life Health Services Inc. for his neck and back pain.  The claimant reported that his pain started about five years prior; that the pain in his neck radiates to his back; that his pain is a 6 out of 10 constantly; and that his pain is aggravated by lifting, sitting, walking, and standing.  Dr. Christopher Cole noted in the "Review of Symptoms" section that the claimant was positive for "Back pain, Decreased mobility, Joint tenderness, Neck pain."  X-ray images of the claimant's cervical spine showed  "mild disc disease at C6/7," but no "acute findings." Dr. Cole's diagnoses included chronic cervicalgia and chronic back pain and he prescribed the claimant 800 mg Ibuprofen for pain.  (R. 533-538, 553).

The claimant returned to Dr. Cole on July 13, 2016 for a follow-up visit. The claimant reported that the pain in his neck is intermittent and described it as "aching and sharp"; that he rated his pain a 6 out of 10; that bending and moving aggravate his pain; and that rest relieves his pain.  During the physical examination, Dr. Cole noted that the claimant's cervical spine was "tender, Range of motion" and that the claimant experienced "mild pain w/ motion."  Dr. Cole's diagnoses included cervicalgia and dorsalgia, and he instructed the claimant to continue taking 800 mg Ibuprofen. (R.540, 543, 545).

At follow-up appointments with Dr. Cole on October 5 and Dr. Jonathan Hood on December 30, 2016 at Quality of Life, the claimant reported his neck pain as a 7 out of 10 on the pain scale and aggravated by bending, lifting, standing, and walking.  Dr. Hood noted in the "Review of Systems" section of his December 30 notes that the claimant was positive for back pain, joint pain, and neck pain.  Both Dr. Cole and Dr. Hood diagnosed the claimant with acute dorsalgia.  In addition to the 800 mg Ibuprofen prescribed by Dr. Cole, the notes from the December 30 visit indicate that the claimant had also been taking 5 mg Norco as needed for pain, but the record is unclear when that prescription started.  Dr. Hood prescribed 50 mg Tramadol

for pain and methocarbamol and tizanidine, both muscle relaxers at the December 30 visit.  (R. 547-565).

At a follow-up visit with Dr. Hood on January 20, 2017, the claimant reported improvement on the prescription pain medication, although he still reported a persistent ache in his upper back that he rated as a 7 out of 10 on the pain scale.  Dr. Hood again diagnosed the claimant with acute dorsalgia and continued him on the prescription pain medications and muscle relaxers.  (R. 566-572).

On August 6, 2017, the claimant sought treatment at St. Vincent Blount Emergency Department for elbow pain after falling off a ladder a week earlier. Dr. Michael Stephen Dumas ordered imaging of the claimant's elbow, which revealed "soft tissue swelling over the olecranon." Dr. Dumas diagnosed the claimant with elbow bursitis, and discharged the claimant with prescriptions for Bactrim, Keflex, Medrol, orphenadrine citrate, Tramadol, and Percocet. (R. 638-653).

Lastly, after the hearing, Dr. June Nichols performed a psychological examination of the claimant on November 6, 2018 at the request of his attorney. Dr. Nichols administered the portion of the Weschler Individual Achievement Test that measures reading ability. The claimant scored a 40 on the Basic Reading component and a 49 on the Reading Comprehension component. Based on the claimant's performance, Dr. Nichols concluded that the claimant is functionally illiterate. She diagnosed the claimant with a Specific Learning Disorder, with impairment in reading, accuracy, and comprehension. (R. 368).

### *The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a video hearing before an

ALJ on November, 29, 2017. The claimant testified that he left school before completing tenth grade to work odd jobs. The claimant, his wife, and his attorney attested to the fact that the claimant cannot read or write, beyond signing his name. (R. 116, 153, 199).

The claimant has not worked since 2012. His last job involved lifting, laying, and cutting plastic pipes on a production line. According to the claimant, these pipes weigh about 250 pounds. He stated that his co-workers helped him on the job by helping him understand what he was supposed to do because he could not read or write and that "if it wasn't for them I couldn't have done it."  (R. 125-127)

The claimant asserted that he left his job because his back and neck pain prevented him from meeting the physical demands of the work. The claimant complained of spurs on his spine that constantly hurt. He testified that would seek more treatment for his back pain but "I just haven't got insurance to go" and he goes to the doctor "when I have the money to go."

He further stated that he has not been actively looking for work because of intense pain in his right hand, which has pins and plates in it, and because of pain in his left elbow, back, and neck. (R.116, 122, 125-28).

The claimant lives in a mobile home with his wife, who is disabled and receives social security disability benefits. He and his wife work together to complete chores, and he tries to help as much as possible. The claimant's wife testified that her husband is capable of making the bed, vacuuming, walking up the three steps to enter the mobile home, mowing the grass with a riding lawnmower, and sometimes picking up sticks in the yard.  According to the claimant's wife, she does most of the cooking, but the claimant can prepare simple meals for himself and can open and cook a can of beans. She also indicated that the claimant can mentally compute change. Additionally, the claimant's wife said that her husband does most of the driving in their

relationship. The claimant sometimes drives about 30 minutes away to see his children. (R. 118, 120, 138, 140, 154).

The claimant's wife stated that her husband had a good attitude toward work and that he would be working if he were capable of doing so. When asked why she thought her husband did not work, the claimant's wife cited the fact that the claimant is illiterate and that many jobs require computer and technology skills. She also said he could not work because of his back pain.  The claimant's wife did, however, state her belief that "if he's able to do a job, I believe he could—he would." (R. 141-144, 148).

When asked why the claimant does not go to the doctor more, his wife said he does not have insurance, and "he was supposed to have an MRI done, but we couldn't come up with the money to put up front for that."  (R. 146-147).

A vocational expert, Ms. Martha Daniels, testified concerning the type and availability of jobs that individuals similarly situated to the claimant could perform. Ms. Daniels stated that the claimant's previous work should be classified as "material hauler," which consists of very heavy exertion and qualifies as unskilled work. (R. 155, 156).

The ALJ posed several hypothetical questions to Ms. Daniels. First, he asked Ms. Daniels to assume a hypothetical individual with the same age, education, work history, and training as the claimant. The ALJ further stipulated the hypothetical individual could occasionally lift and/or pull 50 pounds, sometimes for one-third of an eight-hour workday; frequently lift or pull 25 pounds; sit six hours in an eight-hour workday with customary breaks; and stand or walk six hours in an eight-hour workday. Lastly, the ALJ posited that the hypothetical individual was illiterate. The ALJ then asked Ms. Daniels whether this hypothetical individual would be able to

return to the claimant's previous work. Ms. Daniels responded that the individual could not

return to such work. (R. 156).

The ALJ then asked Ms. Daniels whether any "medium unskilled work" existed that the

hypothetical individual could perform. Ms. Daniels answered that the individual could work as a

dishwasher, with 250,000 dishwasher jobs available in the national economy; laundry worker,

with 30,000 jobs available in the national economy; or industrial cleaner, with 105,000 jobs

available in the national economy. (R. 156-57).

The ALJ posed another hypothetical with the same assumptions, except this hypothetical

individual was limited to light, unskilled work and could occasionally lift or pull only 20 pounds

and frequently lift or pull only 10 pounds. Ms. Daniels responded that the individual in question

could be a garment sorter, with 25,000 jobs available in the national economy; housekeeper, with

90,000 jobs available in the national economy; or hand packer, with 37,000 jobs available in the

national economy.

Lastly, the  claimant's attorney posed questions to Ms. Daniels. First, he asked whether

all the jobs that Ms. Daniels identified would require the use of two hands. She replied that they

would. Lastly, the claimant's attorney asked what absentee rate would be allow for the jobs she

had identified. Ms. Daniels replied that the jobs in question would permit approximately ten

absences a year. (R. 160).

*The ALJ Decision*

On June 27, 2018, the ALJ issued a decision that the claimant was not disabled under the

Social Security Act. First, the ALJ determined that the claimant met the insured status

requirements of the Social Security Act through June 30, 2016. The ALJ also found that claimant

had not engaged in substantial gainful activity during the claimed disability period, beginning on March 1, 2012. (R. 10, 12).

Next, the ALJ found that the claimant did not have a severe impairment or combination of impairments that significantly limited his ability to work. The ALJ stated that the claimant's allegations of neck and back pain were not medically determinable impairments because they "are not supported by formal diagnoses in the record" and "are just subjective complaints of pain and not formally diagnosed conditions."  The ALJ cited X-ray imaging of the claimant's cervical spine in August 2012 that was "unremarkable."  (R. 14)

In contrast, the ALJ found that the pins and plates in the claimant's right hand from a surgery in 2006 constituted a medically determinable impairment; however, the ALJ determined that this impairment was not severe. The ALJ asserted that the claimant's hand impairment did not cause more than minimal limitations to his ability to do basic work-related activities.  In support of this conclusion, the ALJ cited medical examinations from 2015 and Dr. Jones' consultative opinion that demonstrated relatively normal findings, including normal range of motion, grip strength, and gross and fine manipulation in the claimant's right hand. (R. 13-14).

The ALJ, therefore, concluded that the claimant did not present a severe and medically determinable impairment or combination of impairments that significantly limited his ability to perform basic work activities. The ALJ found this conclusion consistent with other evidence in the record. He placed substantial weight on the opinion of Dr. Jones, the consultative examiner, who stated that the claimant "had no restrictions to standing, sitting, walking, bending, stooping, reaching, handling, lifting, or carrying" (R. 13-14).

The ALJ also accorded very limited weight to the testimony of the claimant's wife. He cited the portions of the claimant's wife's testimony stating that the claimant suffers chronic

pain, but sometimes helps with a wide variety of household chores. The ALJ specifically noted that the claimant is able to drive, garden, make a bed, mow grass with a riding mower, traverse the steps at his home, and occasionally fish. In light of the preceding considerations, the ALJ found that the claimant did not have a disability as defined by the Social Security Act during the claimed period. (R.14-15).

## VI. **DISCUSSION**

The claimant argues that the ALJ erred in finding that he did not have a severe impairment or combination of impairments at step two. This court agrees.

In the present case, the ALJ asserted that the claimant's allegations of neck and back pain "are not supported by formal diagnoses in the record." (R. 14). The ALJ, therefore, concluded that claimant's neck and back pain were merely subjective complaints rather than medically-determinable impairments. However, substantial evidence in the record does not support this finding.

Contrary to the ALJ's findings, the record contains formal diagnoses and objective medical evidence to support the claimant's allegations of neck and back pain since 2008.  An X-ray from March 2008 showed that the claimant has "severe right foraminal narrowing at C3-4 and moderate narrowing on the left at this level."  The only MRI of his cervical and lumbar spine of record from January 2009 shows "severe right foraminal narrowing due to osteophytes" or bone spurs at C3-4; broad based disc bulge without significant canal stenosis at C5-6; broad based disc bulge and moderate foraminal narrowing on the right at C6-7; and degenerative disc disease throughout the cervical spine.

Although these objective MRI findings may not support that the claimant automatically meets a Listing for disability, they show that the claimant has a diagnosed medical impairment in

his neck and back that could cause the degree of pain and limitations he has alleged for many years.  The claimant's severe right foraminal narrowing in his spine because of bone spurs and disc bulges support his claim that his pain is worse with activity and improves with rest.  And these MRI findings led to his doctor discussing the possibility of surgery on his spine.  But the ALJ failed to even mention the 2009 MRI findings, much less discuss in any detail any of the medical evidence that would support the claimant's subjective allegations of his neck and back pain.

And contrary to the ALJ's finding, the record contains numerous formal medical diagnoses by different doctors of degenerative disc disease, bone spurs in the spine, and disc bulges based on objective MRI findings, and those findings can constitute a severe impairment at step two. *See Lavinskey v. Astrue*, No. C.A. 07-0700-C, 2008 WL 895722 (S.D. Ala. March 28, 2008) (finding that ALJ erred at step two by finding that degenerative disc disease was not a severe impairment); *cf Ashburn v. Saul*, 4:19-cv-82-AKK, 2020 WL 4428742 *1 (N.D. Ala. July 31, 2020) (ALJ found degenerative disc disease to be a severe impairment at step two); *Colclough v. Saul*, 3:19-cv-70-WC, 2020 WL 4429580 *1 (M.D. Ala. July 31, 2020) (ALJ found degenerative disc disease to be a severe impairment); *Sawls v. Berryhill*, 1:17-cv-624-GMB, 2018 WL 6313007 (M.D. Ala. Dec. 3, 2018) (The ALJ found degenerative disc disease and bone spur formation in the lumbar and cervical spine to be severe impairments at step two); *Walker v. Astrue*, 8:06-cv-2336-T-TGW, 2008 WL 516563, *1 (M.D. Fla. Feb. 22, 2008) (ALJ found degenerative disc disease to be a severe impairment at step two); *Stevens v. Astrue*, 8:06-cv-2006-T-30EAJ, 2008 WL 435177, *2 (M.D. Fla. Feb. 14, 2008) (ALJ found mild degenerative disc disease to be a severe impairment at step two).  But the ALJ in this case failed to even mention the claimant's degenerative disc disease diagnosis or any of the 2009 MRI findings.

The court acknowledges that, after the 2009 MRI, the claimant continued to work lifting, laying, and cutting 250-pound plastic pipes on a production line until 2012, when the claimant stated he physically could no longer work because of his neck and back pain.  Although he continued to work at a job that required repetitive and weight bearing movements, the record shows that the claimant continually sought treatment throughout 2009 and 2010 for his chronic neck and back pain, with accompanying objective medical findings of limited range of motion, muscle spasms, and tenderness.  Again, the ALJ did not mention any of these records even though the objective findings from the claimant's 2009 MRI  and the objective medical findings of limited range of motion, muscle spasms, and tenderness during medical treatment in 2009 and 2010 could support the claimant's allegations of his chronic neck and back pain while working.

After the claimant stopped working in 2012, the record shows that he continued to report back and neck pain, but not as frequently as when he worked.  But as the claimant testified, the more he moves the more pain he has in his neck and back.  So, the fact that the claimant did not seek medical treatment as much after he stopped working in 2012 makes sense both because he was not moving as much and, as he and his wife testified, he had no medical insurance.

But in 2015 when the claimant exerted effort by putting his 50-pound niece on his shoulders, he had to seek medical treatment and Dr. Bowen found that the claimant was "tender to palpation over lower c-spine" and "tender in paraspinous musculature left greater than right." X-ray imaging of the claimant's spine again showed his degenerative disc disease.  And his neck and back pain seemed to worsen in 2016 and was aggravated by lifting, sitting, walking, bending, and standing, but relieved by resting.  Dr. Cole and Dr. Hood noted joint tenderness and decreased range of motion in the claimant's spine in June and October 2016, and Dr. Hood prescribed narcotic pain medications and muscle relaxers to help control the claimant's pain.

Nonetheless, the ALJ concluded that the claimant's neck and back pain were not even medically-determinable impairments based on a single X-ray of the claimant's spine from 2012 that was "unremarkable."  That 2012 X-ray was taken after a vehicle accident and showed that the claimant had no spinal fracture. That X-ray finding in no way contradicts the 2009 MRI findings that showed the claimant's bone spurs, disc bulges, and degenerative disc disease. And although the 2009 MRI was before the claimant's alleged onset date in 2012, the results of that MRI would not have improved without surgery, which the claimant has not undergone.  So, that 2009 MRI would be relevant to the claimant's condition in 2012 and after.  But because the ALJ never mentioned the 2009 MRI findings, the court is unsure whether he even considered it in his decision that the claimant had no severe impairments.

The ALJ gave "substantial weight" to Dr. Jones's opinion that the claimant had absolutely no restrictions standing, sitting, walking, bending, stooping, reaching, handling, lifting, or carrying.  But the court is unclear if the records regarding the 2009 MRI findings were in the records that the DDS gave to Dr. Jones to review before the examination.  Dr. Jones does not reference the 2009 MRI findings anywhere in his opinion or acknowledge the claimant's degenerative disc disease, bone spurs, or bulging disks.  Without knowing if Dr. Jones had the 2009 MRI findings before him, the court is unsure if Dr. Jones had a complete picture of the claimant and his limitations.

And the facts that the claimant could get up and out of a chair without difficulty, could get on and off the examination table without difficulty, and walked  a few steps without difficulty during that one appointment with Dr. Jones do not contradict the lifting, standing, and walking limitations espoused by the claimant.  The claimant admits that he can lift about 20 pounds depending on his pain level; can stand and walk but only for about 15 to 20 minutes before he

has to take a break because of his pain; and can sit for about 30 minutes before he has to get up because of his pain.  The claimant never alleged that he could not walk, stand, or lift at all, but that his neck and back pain limit his ability to do these functions for longer periods of time without pain.  The lack of muscles spasms on that one visit with Dr. Jones, especially when the claimant had not been working or moving vigorously, does not negate the claimant's limitations caused by his neck and back pain.  And Dr. Jones did acknowledge the claimant's decreased range of motion in both his cervical and lumbar spine.  But because the court is unsure if the ALJ or Dr. Jones reviewed or considered the 2009 MRI findings, it cannot determine if the substantial evidence supports the ALJ's unfettered reliance on Dr. Jones' opinion.

The ALJ also gave the testimony of the claimant's wife little weight because the claimant could help with household chores, drive, garden, make a bed, mow grass with a riding mower, and traverse the steps at his home.  But the ALJ failed to explain *how* these activities are inconsistent with the claimant's allegations regarding his walking, standing, and lifting limitations.  None of these activities of daily living the ALJ cited are inconsistent with the claimant's allegations that his neck and back pain limit him to lifting about 20 pounds or less depending on his pain level; bending and squatting but having a hard time getting back up because of his pain; walking and standing only about 15 to 20 minutes at a time without a break and then would need to rest about 20 minutes; sitting about 30 minutes before he would have to stand because of his pain; and having a hard time concentrating on tasks because of his pain. The claimant's admission that he can do simple household chores occasionally, garden sometimes with numerous breaks, or climb three steps into his home are not inconsistent with his subjective allegations of pain and limitations.

The claimant does not have to be an invalid who does absolutely nothing and never leaves his home to be disabled and unable to work full-time. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (substantial evidence did not support the ALJ's finding that the claimant's ability to do simple household chores negated her claims that she had to lie down every two hours because of her impairments); *see also Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("[S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee. . . . Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. . . . It is well settled that sporadic or transitory activity does not disprove disability.") (citations and quotations omitted.)  None of the claimant's daily activities as he reported them are inconsistent with his testimony about the severity of his pain.

Because the ALJ fails to mention or discuss the claimant's 2009 MRI findings, and those MRI findings contradict the ALJ's conclusion that the claimant's allegations of neck and back pain "are not supported by formal diagnoses in the record," the court finds that substantial evidence does not support the ALJ's ultimate determination that the claimant's neck and back pain do not constitute severe impairments at step two.

The court notes that the ALJ was not required to consider the claimant's illiteracy at step two because it is not in and of itself considered a nonexertional impairment. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996)  And the record contains no evidence of the claimant's IQ score showing whether the claimant has an intellectual disability that could constitute a nonexertional impairment. *See Wolfe*, 86 F.3d at 1078.  The claimant was in special education classes as a child; worked only unskilled jobs; and needed help from his co-workers to understand what had to do on the job. Evidence from Dr. June Nichols provided by the claimant

after the ALJ's decision showed that the claimant is functionally illiterate and suffers from a "Specific Learning Disorder with impairment in reading, accuracy and comprehension." (R. 369).  On remand, if the ALJ proceeds past the finding of a severe impairments at step two, he will have to assess the claimant's illiteracy as a vocational factor under the medical-vocational guidelines and should consider developing the record regarding the claimant's IQ score. *See* §404.1564(b)(1).

## VII. **CONCLUSION**

For the reasons above, this court concludes that the decision of the commission should be REVERSED AND REMANDED.

The court will enter a separate order in accordance with the Memorandum Opinion.

DONE and ORDERED this 25th day of September, 2020.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE